UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David Miller,

                Plaintiff,

vs.

City of St. Paul, Thomas Smith,
and Patricia Englund,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-1865 ADM/BRT

---

Nathan W. Kellum, Esq., Center for Religious Expression, Memphis, TN, on behalf of Plaintiff.

Portia Hampton-Flowers, Esq., St. Paul City Attorney's Office, St. Paul, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On June 4, 2015, the undersigned United States District Judge heard oral argument on Plaintiff David Miller's ("Miller") Motion for Preliminary Injunction [Docket No. 6]. Defendants City of St. Paul, Thomas Smith, and Patricia Englund (collectively, "Defendants") oppose the motion. For the reasons set forth below, Miller's motion is denied.

## II. BACKGROUND

**A. The Parties**

Harriet Island Regional Park ("Harriet Island") is a public park located in St. Paul, Minnesota, on the banks of the Mississippi River. Compl. [Docket No. 1] ¶ 24. The Irish Fair of Minnesota, Inc. ("IFM") is a private charitable non-profit organization. Id. ¶ 34. IFM organizes the Irish Fair, an annual three-day event dedicated to celebrating and promoting Irish culture. Id. ¶¶ 33, 34, 36. Harriet Island has served as the venue for the Irish Fair since 2001. Id. ¶ 33. IFM

annually applies for and secures a special event block party permit from the City of St. Paul to hold the Irish Fair at Harriet Island. Id. ¶ 35, Hampton-Flowers Aff. [Docket No. 16] Ex. K. The fair is open to the public and free of charge; no ticket is required to enter the event. Compl. ¶ 40. Harriet Island remains a public park during the Irish Fair, with no gates or barriers limiting access to the park. Id. ¶¶ 40–41.

Miller is a resident of Willmar, Minnesota. Id. ¶ 9. He is a practicing evangelical Christian who shares his religious beliefs regarding Jesus Christ with others in public places. Id. ¶ 13; Miller Aff. [Docket No. 8-1] Ex. A ¶¶ 4, 6, 8. Miller expresses his religious convictions through displaying signs and banners, passing out literature, and open-air preaching. Compl. ¶ 14; Miller Aff. ¶ 8. Miller seeks to share his religious beliefs at Harriet Island during the Irish Fair. Compl. ¶ 23; Miller Aff. ¶ 11.

The City of St. Paul ("The City") is a municipal government authority in the State of Minnesota. Compl. ¶ 10. The City controls and is responsible for regulating public parks in the city. Id. ¶ 10. Defendant Thomas Smith ("Chief Smith") is Chief of Police for the City of St. Paul Police Department. Id. ¶ 11. In his official capacity, Smith is responsible for overseeing numerous policies including law enforcement in public parks. Id. Defendant Patricia Englund ("Commander Englund") is a Patrol Commander with the City of St. Paul Police Department. Id. ¶ 12. In her official capacity, Commander Englund's duties include enforcement of laws and policies regulating activities in public parks. Id.

**B. Events at the 2014 Irish Fair**

On August 9, 2014, Miller went to Harriet Island to share his religious views at the 2014 Irish Fair. Id. ¶ 43. Commander Englund, an unidentified St. Paul Police Officer (the

2

"unidentified Officer"), Miller, and a few of Miller's friends engaged in a dialogue near an entrance to the fair. Id. ¶¶ 46, 50–85. Jason Cooley, one of Miller's friends, recorded this conversation on videotape. Mot. Prelim. Inj. Ex. D [Docket No. 8-4] ("Cooley Aff.") ¶¶ 7, 10, Ex. E [Docket No. 8-5].

At approximately 11:00 a.m., Miller and his group gathered near an entrance to the Irish Fair at the corner of Plato Boulevard and Water Street. Compl. ¶¶ 43, 46. The unidentified Officer approached the group and asked what the members were protesting. Hampton-Flowers Aff. Ex. C ("Video Tr.") at 3. Miller responded, "Oh, we're not protesting, we're preaching." Id. Commander Englund soon joined the unidentified Officer and advised the group that the Irish Fair had a permit, granting it control of Harriet Island as well as 2,000 feet beyond the Island "for [its] sole purpose." Id. at 4. Commander Englund further explained that the permit allowed the IFM to "make the rules for the property. They make the rules. This is the [IFM's] property up until Monday morning when they unload." Id. at 5. A member of the group questioned the constitutionality of Commander Englund's statements, noting that they would not hold up in court. Id. at 5. Commander Englund advised the group that soliciting and protesting would not be allowed at the Irish Fair and that "the signage, all that stuff" was not welcome. Id. at 6. The group responded that they were neither soliciting nor protesting. Id. Miller then posed a series of hypothetical questions to Commander Englund:

> Miller: Are you saying that if I was to set up a banner over by the bandstand I would be arrested?
>
> Commander Englund: I would say I would take it down.
>
> Miller: So if I don't take it down, would I be arrested?
>
> Commander Englund: I would take it down.

3

> Miller: You would take it down?
>
> Commander Englund: I would.
>
> Miller: Okay.
>
> Off-camera speaker No. 1: You would take our property?
>
> Commander Englund: I would take – I would. I would confiscate it. I would hold it and you could come and get it on Monday.
>
> Miller: And if I was to pass out Bible literature, what would you do?
>
> Commander Englund: I would ask you to stop.
>
> Miller: And if I didn't stop?
>
> Commander Englund: I'd probably have to think about it.
>
> Miller: Would you have me arrested?
>
> Commander Englund: I don't know that I would have you arrested. This is the Irish Fair of Minnesota's event and so I would consult with them to see what their preference was.
>
> Miller: If I went over to the bandstand and started to open-air preach, would you arrest me?
>
> Commander Englund: I don't know that I would.
>
> Miller: Well we're going to find out.

Id. at 6–8. After the unidentified Officer and Miller engaged in a brief discussion regarding Miller's religious convictions, Commander Englund again reiterated that the public attending the fair was "subject to [the Irish Fair's] rules and regulations" and compared the situation to a private nightclub maintaining control of the behavior within their establishment. Id. at 10. Englund also clarified that people could only be ejected from the fair based on behavior, not on the basis of "who they are, based on their race, sex, or sexual orientation." Id. at 11–12. Near

4

the end of the conversation, Commander Englund gave the group permission to perform its desired activities on the other side of the street. Id. at 14. The group began to discuss the possibility of a lawsuit and told Commander Englund that she would be named as a defendant in any such lawsuit. Id. at 15–17. Miller asked a final time whether he would be arrested if he were to enter the fair and open air preach, to which Commander Englund responded, "I – I haven't decided yet." Id. at 16. The conversation concluded with Commander Englund telling the group that any public sidewalk in the city may be "permitted for [a private party's] purpose" with city approval. Id. at 21–22. The group then walked a short distance away after saying that they were going to "talk about it" and "see what [they] want[ed] to do." Id. at 22. Miller, however, made no attempt to enter the Irish Fair that day. Compl. ¶ 87.

On September 29, 2014, Miller's counsel sent a letter to the Mayor of St. Paul, the St. Paul City Attorney, and Chief Smith, alleging that the City violated Miller's First Amendment rights. Id. ¶ 93; Mot. Prelim. Inj. [Docket No. 8-7] Ex. G. A St. Paul Assistant City Attorney sent a letter in response on November 10, 2014. Compl. ¶ 96. The response letter denied any wrongdoing on the part of the City, stating "Like every other citizen, Mr. Miller may engage in constitutionally protected speech in traditional public fora within the City, including parks, subject to reasonable time, place, and manner restrictions that are content neutral, narrowly tailored, and allow alternative channels for communication." Mot. Prelim. Inj. [Docket No. 8-8] Ex. H.

Miller initiated this action on April 3, 2015, asserting claims for violation of the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 103–10.

5

**C. The Instant Motion**

Miller now moves for a preliminary injunction, claiming that Defendants are implementing a "heckler's veto" of Miller's expressive activities. That is, Miller argues that the Defendants are enforcing rules dictated by the IFM, allowing the private entity to determine which expressive activities will be tolerated. See Frye v. Kansas City Mo. Police Dept., 375 F.3d 785, 793 (8th Cir. 2004) (Bye, J., dissenting) ("The prohibition of hecklers' vetoes is, in essence, the First Amendment protection against the government effectuating a complaining citizen's viewpoint discrimination."). Miller therefore seeks to enjoin Defendants "from applying a policy and practice that facilitates a heckler's veto banning Miller's religious expression, on its face and as-applied, that precludes Miller and other third party individuals from engaging in any form of individual expression in Harriet Island Regional Park in downtown St. Paul, Minnesota during the 2015 Irish Fair of Minnesota and future Irish Fairs of Minnesota." Mot. Prelim. Inj. Defendants respond that Miller lacks standing to assert his claims. Defendants further argue that even if Miller did have standing, he is not entitled to a preliminary injunction. Although Defendants admit Commander Englund misunderstood the limitations of the IFM's permit, they argue she took no overt action to prevent Miller from engaging in protected speech and thus Miller would not succeed on the merits of his underlying First Amendment claim.

### III. DISCUSSION

**A. Standard of Review**

On a motion for preliminary injunctive relief, the Court considers four factors: (1) the movant's probability of success on the merits; (2) the threat of irreparable harm to the movant if relief is not granted; (3) the balance of harm to the movant if relief is not granted and harm to the

6

non-movants if an injunction is issued; and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all four Dataphase factors. Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). Because the temporary loss of First Amendment freedoms is an irreparable harm, "[i]n a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008).

## B. Standing

The Court first considers whether Miller has sufficiently alleged a justiciable case or controversy under Article III of the Constitution. U.S. Const. art. III, § 2, cl. 1; see also Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the constitution and the statutes enacted by Congress pursuant thereto."). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). As such, whether a party has standing is a threshold question in deciding if a federal court may proceed in hearing a case. Eckles v. City of Corydon, 341 F.3d 762, 767 (8th Cir. 2003). A plaintiff must establish three elements in order to satisfy the standing requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

7

Lujan, 504 U.S. at 560–61 (internal citation, quotation marks, and footnote omitted).

In response to Defendants' claim that Miller lacks standing, Miller argues that although he desired to engage in protected speech at the 2014 fair, he was chilled from doing so because he feared arrest based on Commander Englund's responses. According to Miller, this chilling effect is sufficient to confer standing on his First Amendment claim.[1] Defendants respond that Miller's fear stemmed from inferences he drew from Commander Englund's responses to his hypothetical questions and this "subjective chill" is inadequate to invoke standing.

Under Supreme Court precedent, a claim of a chilling effect, in and of itself, is not sufficient to confer standing for a First Amendment claim. In Laird v. Tatum, the Supreme Court evaluated a declaratory judgment action seeking a judicial declaration that alleged surveillance by the Army of "lawful and peaceful civilian activity" was unconstitutional. 408 U.S. 1 (1972). The Court found that the plaintiffs' subjective claims of a chilling effect due to the existence of a surveillance policy were insufficient to confer standing, concluding that "[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Id. at 13–14.

Similarly, in Eckles v. City of Corydon, the Eighth Circuit analyzed whether a plaintiff had standing to pursue a First Amendment claim related to the defendants' efforts to force the plaintiff to remove signs he posted on his property. 341 F.3d 762. The city defendant in that case issued a series of nuisance abatement notices to the plaintiff requiring that all signage be

---

[1] Miller does not reference his due process claim in his motion for a preliminary injunction. That is, he makes no argument that a preliminary injunction is warranted due to probability of success on the merits of that claim. Miller grounds his standing argument exclusively in the chilling effect related to the First Amendment claim. Accordingly, the Court will limit its analysis to the First Amendment claim.

8

removed, stating that if the signs were not removed within a certain time period, the city would effectuate their removal and charge the plaintiff with the costs. Id. at 766. After the plaintiff initiated suit, the city assured the defendant that it would not seek to abate the nuisance during the pendency of the lawsuit. Id. The district court concluded that the notice to abate did not constitute an injury in fact to confer standing. Id. at 767. The Eighth Circuit reversed, finding that the threat of injury was imminent and concrete as it related to the city defendants because there was nothing to prevent the city from enforcing the notice if it so chose. Id. at 767–68. In summarizing standing in the First Amendment context, the Eighth Circuit stated that "[r]egarding charges that [a plaintiff's] constitutional rights were violated, he must present more than allegations of a subjective chill. There must be a claim of specific present objective harm or a threat of specific future harm." Id. (internal quotation marks and citation marks omitted).

Here, Miller has not satisfied this burden as he has not shown that he faced a specific present objective harm. It is simply too speculative for standing purposes to allege that had Miller and his companions actually entered the fair and engaged in protected conduct, Commander Englund would have responded in a certain way. This is especially so given the context of Commander Englund's statements—the statements were in response to a series of hypothetical questions posed by Miller and his companions. Although Commander Englund stated she would remove and confiscate a banner hung by the bandstand and ask the group to stop distributing literature, she never took any overt action to prevent this conduct. Miller was not denied entrance to the fair or removed from the fair based on his activities. Miller made the affirmative choice to not enter the fair—after finishing their conversation with the officers, the group stated that they needed to discuss amongst themselves whether they would enter the fair.

9

Miller's choice not to enter the fair was based on subjective inferences he drew from his conversation with Commander Englund, not any overt actions taken by Commander Englund.

Nor can Miller establish that a threat of a specific future harm exists. The City Attorney's Office has since assured Miller that it will not prevent him from exercising his First Amendment rights. In response to Miller's complaints regarding the events at the 2014 Fair, the City Attorney's Office stated in a November 2014 letter that "[l]ike every other citizen, Mr. Miller may engage in constitutionally protected speech in traditional public fora within the City, including parks, subject to reasonable time, place, and manner restrictions that are content neutral, narrowly tailored, and allow alternative channels for communication." Miller Aff. Ex. H. As noted by Defendants, "[t]his correspondence is evidence of the Defendants' intent and commitment to allow Miller to engage in protected speech at the 2015 Irish Fair." Mem. Opp'n Mot. Prelim. Inj. [Docket No. 15] at 14.

In support of his argument that his rights have been chilled, Miller cites to numerous cases wherein federal courts evaluated a plaintiff's alleged chill of First Amendment activities in the context of a facial challenge to a criminal statute. See e.g. St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481 (8th Cir. 2006) (challenging state statutes regulating corporate contributions to candidates for political office); Zanders v. Swanson, 573 F.3d 591 (8th Cir. 2009) (evaluating pre-enforcement challenge of a state statute making it a crime to knowingly submit a false report of police misconduct); 281 Care Committee v. Arneson, 638 F.3d 621 (8th Cir. 2011) (challenging state statute that made it a crime to knowingly or with reckless disregard for the truth make a false statement regarding a proposed ballot initiative). Such cases establish that upon asserting a First Amendment challenge to a criminal statute, a

plaintiff does not need to actually expose him or herself to arrest or prosecution to demonstrate an injury in fact for standing purposes. Saint Paul Area Chamber of Commerce, 439 F.3d at 485 (8th Cir. 2006). In this context, the plaintiff need only demonstrate that he or she was objectively reasonably chilled from exercising First Amendment rights. Republican Party of Minn., Third Congressional Dist. v. Klobuchar, 381 F.3d 785, 792 (8th Cir. 2004). In order to establish an objectively reasonable chill of activity, the plaintiff must face "a credible threat of prosecution under a statute if the plaintiff actually engages in the prohibited expression." Id.

Here, Miller argues that under this standard, he was not required to "play chicken" with Commander Englund and subject himself to arrest. Yet, nowhere in Miller's memoranda or Complaint does he identify or challenge a specific criminal statute or ordinance. Rather, Miller seems to make a more general argument regarding the City's policy of relinquishing control and First Amendment regulation to the IFM. Accordingly, the Court finds that an analysis on whether Miller faced some "credible threat of prosecution under a statute" to be inapplicable here for standing purposes when he has failed to identify a criminal statute in the first instance.

In sum, based on Miller and Commander Englund's interaction at the 2014 Fair and Defendants' assurances that Miller can exercise his First Amendment rights at the 2015 Fair, the Court cannot conclude that Miller has asserted a claim of specific present objective harm or a threat of specific future harm sufficient to establish standing. As stated by the Eighth Circuit, "[w]hile general factual allegations of injury might suffice to establish standing in some instances, general allegations of possible or potential injury do not." Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009) (emphasis in original).

Due to his lack of standing, Miller has not established a justiciable case or controversy as

11

required by Article III.  Accordingly, Miller's preliminary injunction motion is denied and this case is dismissed for lack of subject matter jurisdiction.  See Nails Const. Co. v. City of St. Paul, CIV 06-2657, 2007 WL 423187, *15 (D. Minn. Feb. 6, 2007) (denying a preliminary injunction for lack of standing and dismissing action).

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff David Miller's Motion for Preliminary Injunction [Docket No. 6] is **DENIED**; and

2. the Complaint is **DISMISSED** for lack of subject matter jurisdiction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 3, 2015.